United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8
IN THE UNITED STATES DISTRICT COURT

9
FOR THE NORTHERN DISTRICT OF CALIFORNIA

10
DANIEL GARCIA ORNELAS,          )      No. C 09-0344 MMC (PR)
                                )
11
            Petitioner,          )      **ORDER DENYING PETITION FOR**
                                )      **WRIT OF HABEAS CORPUS;**
12
v.                              )      **DENYING CERTIFICATE OF**
                                )      **APPEALABILITY; DENYING**
13
CONNIE GIPSON, Warden,          )      **REQUEST FOR APPOINTMENT OF**
                                )      **COUNSEL; DIRECTIONS TO**
14
            Respondent.          )      **CLERK**
_____ )

15

16

17
        Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant

18
to 28 U.S.C. § 2254 by petitioner Daniel G. Ornelas, who proceeds pro se and challenges the

19
validity of a judgment obtained against him in state court.  Respondent has filed an answer to

20
the petition, and petitioner has filed a traverse.[1]

21
                              **I.  PROCEDURAL HISTORY**

22
        In 2006, in the Superior Court of Santa Clara County, petitioner was convicted of

23
three counts of lewd conduct on a child under the age of 14 years.  (Ex. 1 at 193-94, 196.)[2]

24
Additionally, the jury found true the allegation that petitioner had suffered a prior conviction

25

26
        [1] Petitioner initially brought this action against Darrell Adams, the former warden of
Corcoran State Prison, the facility at which petitioner is incarcerated.  Pursuant to Rule 25(d)
27
of the Federal Rules of Civil Procedure, Connie Gipson, the current warden of Corcoran
State Prison, is hereby substituted as respondent in place of petitioner's prior custodian.

28
        [2] All references herein to exhibits are to exhibits submitted by respondent in support
of the Answer.

1  under California Penal Code section 288(a) (id. at 195), and the court found the prior

2  conviction constituted a strike (id. at 192).  Petitioner was sentenced to a term of twenty-five

3  years in state prison.  (Id. at 199.)

4      In a reasoned opinion, the California Court of Appeal affirmed petitioner's

5  conviction.  (Ex. 7.)  The California Supreme Court summarily denied the petition for

6  review.  (Ex. 9.)

7      On January 26, 2009, petitioner filed the instant petition for a writ of habeas corpus.

8  ## II.  STATEMENT OF FACTS

9      The California Court of Appeal found the facts underlying petitioner's conviction to

10  be as follows:

11  *The Prosecution's Case*

12  The Current Offenses

13  Nicole, who was born in 1984, was best friends in elementary school with
Rebeca, [petitioner's] youngest daughter.  When Nicole was 12, she and
several other girls attended a slumber party for Rebeca's 12th birthday.
Everyone slept side-by-side on the floor in Rebeca's bedroom, and Nicole
slept by the door.  After the other girls fell asleep, but while Nicole was still
awake, she felt [petitioner's] cold hand rubbing her buttocks under her
underwear.  She immediately rolled over on her back and opened her eyes.
[Petitioner] said that he was just covering her with some blankets, and then
he left.  She did not say anything to him and she did not tell anyone else
what happened.  She continued to be friends with Rebeca, and continued
visiting her home.  She did not have any other problems with [petitioner],
other than the way he hugged her when he greeted her.  "[I]t was not the
way you should hug a twelve-year-old little girl."  "He would go for the
hug, but then like slide his hand down my butt and like let go like that; like,
made it seem like he was just trying to let go, but his hands just somehow
slid down my butt."

Lorie, who was also born in 1984, and who was also good friends with
Rebeca in elementary school, would often visit Rebeca at her home and
sometimes spent the night there.  One night while they were in the sixth or
seventh grade, and while Lorie was sleeping on her back on the floor of
Rebeca's room, she woke up when she heard [petitioner] enter the room.
[Petitioner] knelt down beside her and rubbed her on her breasts over her
pajamas.  She rolled over towards the bed and he rubbed her buttocks under
her pajamas but over her underwear.  After a few seconds, he stopped and
left.  Lorie did not say anything to [petitioner], and she did not tell anyone
else what happened.  She continued to remain friends with Rebeca, but she
distanced herself from [petitioner].

[Petitioner] touched Lorie on her buttocks over her pajamas another time
while she slept on the floor of Rebeca's room.  However, Lorie could not

2

remember whether this was the first or the second time [petitioner] touched her.

Rebeca had a barbeque at her house on March 7, 1998.  Her sister Jenny, [petitioner], and a lot of Rebeca's school friends were there, including Nicole, Lorie, Debra, and Destiny.

Nicole testified[3] that, before going to the barbeque, she asked Destiny to not leave her alone with [petitioner].  It rained during the barbeque, and Nicole held an umbrella for [petitioner] while he did the barbecuing.  After the other person with them left, [petitioner] touched Nicole on her left upper thigh below her skirt line in a way that made her feel uncomfortable.  She moved his hand away, gave him the umbrella, and went inside.  Nicole told Lorie and Debra that she was feeling uncomfortable, and that [petitioner] had touched her in the past.  Lorie said that the same thing happened to her, so they decided to tell Rebeca.  Nicole told Rebeca that [petitioner] touched her in places that she did not like and that it made her feel uncomfortable.

Destiny testified that Nicole asked her during the party to stay with her because she felt uncomfortable in the house.  When Destiny asked her why, Nicole said that she would tell her later.  Destiny did not see anything happen between [petitioner] and Nicole at the party.  However, she saw Nicole pull away from [petitioner] outside, say "'no,'" and walk into the house.  Destiny asked Nicole what happened, but Nicole said, "'Nothing.'"  After that, Destiny tried to stay with Nicole, but she had to leave the party early.  Later in private, she and Nicole discussed what happened to Nicole.  Nicole said that when she slept on the floor of Rebeca's room, [petitioner's] cold hands touched her buttocks.  When she rolled over and asked him what he was doing, he said that he was just covering her up.  Nicole also said that [petitioner] touched her by her breasts.  Nicole was embarrassed about the situation and afraid of losing Rebeca's friendship.

Lorie testified that she was in the kitchen and Nicole and [petitioner] were outside when Lorie saw [petitioner] touch Nicole on her buttocks during the party.  Nicole walked away and Lorie followed her.  Debra joined them.  Nicole and Lorie started talking about what happened.  They told each other that [petitioner] had touched them while they were sleeping, and they decided that they had to tell Rebeca about it.  Lorie told Rebeca that [petitioner] had touched her when she was spending the night.

Debra testified that [petitioner] never touched her in a way that made her feel uncomfortable.  Nor did she see [petitioner] touch other girls inappropriately.  During the March 1998 barbeque, Nicole and Lorie told Rebeca and her sister Jenny about incidents that occurred when they spent the night.  Debra was asked if anything like that ever happened to her, and she said no.  She did say that the way [petitioner] hugged her when she arrived at the party was "a little weird."  [Petitioner] had patted her on the butt during the hug and then he rubbed the outside of her thighs.

Rebeca testified that Lorie did the talking that night because Nicole was crying.  Lorie said that [petitioner] had touched both Nicole and her.  He had touched Lorie on her chest one night while she was sleeping over.  He

---

[3]     Nicole admitted that, on October 8, 2002, she was convicted of misdemeanor possession of stolen property.

United States District Court

For the Northern District of California

had touched Nicole at the party underneath her skirt. Nicole agreed with Lorie's report. This was the first time Rebeca heard about the incidents. Rebeca asked Debra if anything happened to her, and Debra said that [petitioner] gave her a hug and touched her butt when she greeted him that night. Rebeca told Jenny what happened, and they tried to call their mother. Rebeca then told everybody that the party was over and to call their parents to go home.

Somebody called the police. The police escorted Lorie home, where she told the police and her parents what happened. Nicole also told her mother and the police what happened. The next day, Rebeca's mother apologized to Nicole and to Lorie.

[Petitioner] failed to appear in this matter on the master trial calendar on April 26, 1999. He was arrested on the outstanding bench warrant in this matter on March 22, 2006.

Rebeca's mother, who is now divorced from [petitioner], testified that she has four daughters. [Petitioner] is the father of her three youngest daughters, including Jenny and Rebeca, and she has an older daughter Kathy. [Petitioner] was arrested for inappropriately touching a neighborhood child in 1981. He was arrested again in 1993. She never saw [petitioner] inappropriately touch Rebeca's friends. She was not at the 1998 barbeque, and only learned about what happened after she got home. [Petitioner] told her, "'I'm sorry. I just slapped her butt.'" She went to Lorie's house the next day to apologize for whatever happened. [Petitioner] left the country in 1999 because he was due to appear in court and he said that he did not want to go to jail. [Petitioner] called her several times after that, but she usually hung up when she heard his voice. In 2005, he called to let the children know that his mother had passed away.

The Evidence Code Section 1108 Evidence

Carla testified that, in 1981 when she was seven years old, she was touched in a way that made her feel uncomfortable while she was at the home of her friend Kathy. She went to Kathy's house to get a book and Kathy's step-father answered the door. He said that nobody else was home but that she could look for the book. He went with her into Kathy's room. While she was looking for the book in the closet, he sat on the edge of the bed and rubbed and caressed her buttocks and vaginal area over clothing. Kathy felt uncomfortable but she continued what she was doing. The man put his hand down the back of her pants and rubbed her buttocks. He also offered her a dollar to take her pants off. She said no, and that she had to go home. He said that if she came back the next day he would give her a TV. When she got home, she told her mother that she was never going back. When her mother pressed her for an explanation, Carla told her mother what happened. Her mother called the police. She did not have to testify in court about what happened because the man pleaded guilty.

Carla's mother testified that when Carla came home from her friend Kathy's house that day, Carla was upset and said that she was never going back. After being pressed, Carla said that Kathy's step-father answered the door and told her that she could look for the book. While she was in Kathy's bedroom, bent over and looking in the closet for the book, the man touched her from behind on her genital area. He then put her on his lap and put his hand inside her pants. He said that he would give her a dollar if she

4

let him touch her or take her pants off.  He also said that if she came the next day he would give her Kathy's TV.

The parties stipulated that [petitioner] pleaded guilty on December 28, 1981, to a violation of section 288, subdivision (a), lewd conduct on a child under 14, and that the charges arose out of an incident that occurred on October 5, 1981, between [petitioner] and Carla.

Donald testified that in 1981, when he was 11 years old, a man who lived on his street showed him pornographic magazines and exposed himself while they were in the garage in the back of the man's house.  Donald had approached the man looking for a job.  The man opened a Playboy magazine and showed him the centerfold.  He then took his erect penis out of his pants and asked Donald to touch it.  Donald poked at the man's penis, then went home and told his mother.  His mother called the police and he told the police what happened.

The parties stipulated that [petitioner] was the person alleged to have molested Donald in 1981.

Carol, age 43, testified about an incident that occurred in 1993 while she was in a movie theater.  The theater was not full, and she sat in the center section near the aisle.  Well after the move started, a man came in and sat down two rows in front of her and a few seats over.  The man kept moving and looking around.  She thought that it was odd so she kept an eye on him.  He stopped looking around and started moving rhythmically.  Because she thought that he was masturbating, she left.  But then, because she didn't want to accuse him before being sure, she went back in and looked over the man's shoulder.  She saw his fully exposed erect penis and his hand, and saw that he was masturbating.  She then reported it to the theater manager.  The police were called and she told them what she saw.

The parties stipulated that [petitioner] pleaded no contest on September 7, 1993, to a violation section 647, subdivision (a), lewd conduct in public.

*The Defense Case*

Reyes Beas testified that he has known [petitioner] for about 20 years and that he attended a lot of parties at [petitioner's] house.  [Petitioner] was always very friendly with Beas's two sons and all of the other children there.  Beas never noticed [petitioner] touching any of the children inappropriately.  He was not aware that [petitioner] molested a seven-year-old girl and an 11-year-old boy in 1981, and that [petitioner] exposed himself and masturbated in a movie theater in 1993.

Pete Flores testified that he has known [petitioner] for about 18 years and that he was at the barbecue at [petitioner's] home on March 7, 1998.  It was raining, and [petitioner] did the barbecuing while Flores stood next to him and talked.  Everybody who came to the party greeted [petitioner].  Some of the children hugged [petitioner], including one of Rebeca's friends, but Flores does not remember [petitioner] hugging people in general.  When [petitioner] was done barbecuing, he and Flores talked in the living room.  Flores does not remember something happening at the barbecue that made some of the children there upset.  In all the time Flores has known [petitioner], he never saw [petitioner] touching any child inappropriately.  Flores would still trust [petitioner] with his children.  Knowing that

[petitioner] molested a seven-year-old girl and an 11-year-old boy in 1981, and that he exposed himself and masturbated in a movie theater in 1993, would change Flores's opinion of [petitioner].

[Petitioner] testified in his own behalf that he was arrested and accused of doing something to a boy in 1981. The boy had approached him looking for a job while he was underneath his car changing its oil in his garage. He told the boy that he did not have a job or money to give him. He told the boy to leave but the boy did not do so. The boy started talking rudely and searching the garage, which [petitioner] shared with his neighbor. The boy might have found some pornographic magazines in the neighbor's boxes; the boy said that [petitioner] had some dirty books and showed some to [petitioner]. [Petitioner] said that they did not belong to him and to leave them where they were. He did not expose himself to the boy or ask the boy to touch his penis. He thinks the boy lied about what happened because he was angry at [petitioner] for not giving him any work. Although [petitioner] was arrested for having touched the boy inappropriately, he did not plead guilty to any sexual misconduct involving the boy. His understanding is that charges relating to Donald were dismissed in view of his plea to the charges involving Carla.

[Petitioner] pleaded guilty to one act of lewd conduct with a child under 14 relating to the charges involving Carla. The day that Carla came to his house, he arrived home from work carrying groceries while she was knocking at his door. Nobody else was home and he asked her in Spanish who she was looking for. She responded in English, and all he could understand was "'Kathy has a book.'" [Petitioner] asked her more questions in Spanish, but she started crying. A woman called Carla from across the street, and she ran to the woman. The woman yelled at [petitioner] so he went looking for his wife. He never let Carla into his house and he never touched her in any way. He thinks that Carla made up her story because she was upset at him for not giving her Kathy's book. He pleaded guilty to lewd conduct because he was afraid of going to prison and losing his family and his job; by pleading guilty he avoided that possibility even though he did go to jail. He does not remember telling a probation officer after his conviction that he let Carla into his home, and he did not tell the probation officer that he touched Carla's butt.

In 1993, he was arrested at the movie theater. He went there thinking he was going to see an action film. He got there about 10 minutes after the movie started and soon realized that the movie was boring. He had bought a soda and he looked for a cup holder after he sat down. His seat did not have a cup holder, and he looked around for a seat that did, but he could not see anything in the dark theater. He decided to stay where he was and he placed his soda between his legs. He did not remove his penis from his pants and he did not masturbate. About 10 minutes later a police officer came, shined a flashlight in his face, and told him to step outside. He does not remember telling an officer that his zipper got stuck when he used the bathroom, and that he tried zipping it up while he was in the theater but he could not get it zipped up. He pleaded guilty in the case but he did not have to go to jail.

Usually his wife was home when his daughters had sleepovers at his house. At times he would have to wait for his wife to arrive home. After she did, he would go into his daughter's room to check to see how the girls were doing, whether they were asleep or covered up. He never touched any of

United States District Court

For the Northern District of California

the girls, even accidentally, while he was covering them up. He recalls covering up Nicole two or three times, but he never touched her buttocks. Nor did he touch Lorie's breasts or buttocks.

He would often have parties at his house and sometimes more than 50 or 60 people, including adults and children attended them. He would greet everybody when they arrived, and sometimes he hugged his friends and their children. At no time when he hugged the children did he have any sexual thoughts towards them.

Some of [petitioner's] friends were at the barbecue on March 7, 1998, but the majority of the people there were Rebeca's friends. He did not greet people when they arrived because he was busying barbecuing. He greeted them when they came out to the backyard. Flores stayed outside with [petitioner] for more than an hour, but went inside before he finished cooking. Nicole greeted [petitioner] while Flores was still there. She hugged him and, because he had things in his hands, he just put one of his arms around her shoulder. She stood next to him holding an umbrella while talking with her friends because it was sprinkling. He did not touch her buttocks or her leg, and she never became upset or pushed him away. He thinks that Nicole and Lorie made up their allegations in order to ruin Rebeca's party.

He left the country while he was awaiting trial because his attorney told him that the case was "very delicate." He is not guilty but he wanted to avoid going to prison. He was afraid that he was going to lose his family, friends, employment, and house. Also, he was told that his mother was very ill and that he might not see her again. He left the week before he was scheduled to come to court and went to Mexico to see his mother. He stayed with her for eight or nine months and then went to Baja California. He stayed there working for about two years, then went back and stayed with his mother for close to a year. His mother died in 2005. He returned to the United States in March 2006 in order to take his ill boss from a hospital in the United States to her home in Mexico. He was aware that there was a warrant out for his arrest, and that he could be arrested, but he came back anyway.

(Ex. 7 at 3-11.)

### III.  DISCUSSION

A.    Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

7

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict."  Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Id. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

In the present case, the only state court to address the merits of petitioner's claims was the California Court of Appeal on direct review.  (See Ex. 7.)  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of

1    Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797,

2    803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

3    B.    Petitioner's Claims

4         Petitioner claims his conviction and sentence are invalid because: (1) the trial court

5    erred in admitting evidence of prior sexual offenses under California Evidence Code section

6    1108; (2) petitioner was denied effective assistance of trial counsel; (3) the trial court erred in

7    admitting petitioner's prior statement from a 1981 probation report; and (4) the trial court

8    erred in instructing the jury under CALCRIM No. 1191.  The Court addresses each claim in

9    turn.

10        1.    Propensity Evidence

11        Petitioner claims the admission of evidence, pursuant to California Evidence Code

12   section 1108[4], of prior sex offenses against Carla and Donald violated his due process rights.

13   (Pet. at 13.)[5]  Petitioner can prevail on this claim only if the state court's decision to allow the

14   propensity evidence under section 1108 was "contrary to, or involved an unreasonable

15   application of, clearly established Federal law, as determined by the Supreme Court of the

16   United States."  28 U.S.C. § 2254(d).

17        To date, the Supreme Court has left open the question whether a state law allowing

18   admission of propensity evidence violates due process.  See Estelle v. McGuire, 502 U.S. 62,

19   75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due

20   Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to

21   commit a charged crime."); see also Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir.

22

23        [4]  Subdivision (a) of section 1108 provides, in pertinent part: "In a criminal action in
24   which the defendant is accused of a sexual offense, evidence of the defendant's commission
     of another sexual offense or offenses is not made inadmissible by Section 1101, if the
25   evidence is not inadmissible pursuant to Section 352."  Section 1108 grants California judges
     discretion to admit evidence of prior uncharged sex offenses in order to show a propensity on
26   the part of an individual to commit such crimes, provided the probative value of the evidence
     is not outweighed by the probability that admission of the evidence will necessitate undue
27   consumption of time, or create undue prejudice, confusion, or mislead the jury.  See People
     v. Falsetta, 21 Cal. 4th 903, 916 (1999); Cal. Evid. Code § 352.

28        [5]  As referenced herein, the pages of the petition have been assigned numbers
     sequentially, beginning with the title page.

9

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    2001), rev'd on other grounds, 538 U.S. 202 (2003) ("[T]he Supreme Court has never

2    expressly held that it violates due process to admit other crimes evidence for the purpose of

3    showing conduct in conformity therewith.")  Based on the Supreme Court's express

4    reservation of this issue as an "open question," the Ninth Circuit has held that a due process

5    right barring the admission of propensity evidence is not "clearly established" within the

6    meaning of section 2254(d).  Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006).

7         Accordingly, petitioner is not entitled to habeas relief on this claim.

8         2.    Ineffective Assistance of Counsel

9         Petitioner claims defense counsel was ineffective in failing "to seek to impeach

10   Donald with his prior misdemeanor conviction for annoying or molesting a child and in

11   failing to object to the court's erroneous ruling excluding this impeachment evidence.  (Pet.

12   at 17.)

13         The Court of Appeal summarized the background of this claim as follows:

14         The prosecutor advised the court and [petitioner] that Nicole suffered a
          misdemeanor conviction in 2002 for a violation of section 496, subdivision
15         (a), possession of stolen property, and that Donald suffered a misdemeanor
          conviction in 1989 for a violation of section 647.6, annoying or molesting a
16         child under 18.  Although both offenses involved moral turpitude, the
          prosecutor requested that the court exclude evidence of the convictions
17         pursuant to Evidence Code section 352, as the offenses occurred after the
          victims reported [petitioner's] conduct and therefore their offenses "don't
18         have any bearing on the credibility of the statements they gave or on the
          reports they made."  Defense counsel argued that Nicole's conviction "does
19         tend to impeach a witness, whether it occurred before she made the
          complaints or not," and that it "would be important" for the jury "to be
20         aware of this crime . . . and to be able to use that in weighing the credibility
          of her testimony."  Counsel did not oppose the prosecutor's request to
21         exclude evidence of Donald's conviction.  The court denied the
          prosecutor's request to exclude evidence of Nicole's conviction, but ruled
22         as to Donald's conviction that, "[g]iven the age of that prior, the fact that
          there hasn't been any subsequent conduct, I think it would be more
23         prejudicial than probative, and so I won't allow Donald['s] prior to be
          used."
24
          [Petitioner] now contends that he was denied his right to effective
25         assistance of counsel when counsel failed to seek to impeach Donald with
          his prior conviction.  He argues that Donald's conviction was admissible for
26         impeachment purposes, and that counsel had no reasonable tactical basis for
          failing to seek to impeach Donald with that conviction or for failing to
27         object to the court's ruling excluding the evidence.

28   (Ex. 7 at 15-16.)

                                        10

**United States District Court**
For the Northern District of California

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but "effective" assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment claim based on ineffectiveness of counsel, a petitioner first must establish such counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, the petitioner must establish prejudice resulting from his counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

A federal habeas court considering an ineffective assistance claim need not address the prejudice prong of the Strickland test "if the petitioner cannot even establish incompetence under the first prong." Siripongs v. Calderon, 133 F.3d 732, 737 (9th Cir. 1998). Conversely, the court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697.

A "doubly" deferential judicial review applies in analyzing ineffective assistance of counsel claims under 28 U.S.C. § 2254. See Cullen v. Pinholster, 131 S. Ct. 1388, 1410-11 (2011). The rule of Strickland, i.e., that a defense counsel's effectiveness is reviewed with great deference, coupled with AEDPA's deferential standard, results in double deference. See Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010). Put another way, when § 2254(d) applies, "the question is not whether counsel's actions were reasonable[;] [t]he question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington v. Richter, 131 S. Ct. 770, 788 (2011). Moreover, because Strickland's standard for assessing defense counsel's effectiveness is a "general" one, state courts have "greater leeway in reasonably applying that rule," which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." See Cheney, 614 F.3d at 995 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

1    Here, the Court of Appeal first observed that the failure to impeach a witness or object

2  to evidence usually involves defense counsel's tactical decisions and seldom establishes

3  incompetence.  (Ex. 7 at 17.)   The Court of Appeal further determined petitioner had not

4  demonstrated prejudice, finding as follows:

5         Even if we were to determine that counsel's decision not to seek to impeach
          Donald was not a reasonable tactical decision, we would find no prejudice.
6         Even if the court had admitted the impeachment evidence, and the jury had
          disbelieved Donald's testimony, there is not a reasonable probability that a
7         result more favorable to [petitioner] would have occurred.  The evidence
          against [petitioner] relating both to his charged offenses and his other prior
8         offenses was strong.  Both Lorie and Nicole described similar conduct by
          [petitioner] that occurred in similar situations.  In addition, [petitioner]
9         admitted pleading guilty to charges involving the conduct that Carla and
          Carol testified to.  Accordingly, [petitioner] has not demonstrated that
10        counsel rendered constitutionally ineffective assistance.

11  (Ex. 7. at 17-18.)

12    Although trial counsel might have pursued a more vigorous cross-examination of

13  Donald, the Court of Appeal's conclusion that his conduct was reasonable is not an incorrect

14  application of Supreme Court precedent or an unreasonable determination of fact sufficient to

15  grant the petition under section 2254.  A federal habeas court must "give 'great deference' to

16  'counsel's decisions at trial, such as refraining from cross-examining a particular witness.'"

17  Brown v. Uttecht, 530 F.3d 1031, 1036 (9th Cir. 2008) (quoting Dows v. Wood, 211 F.3d

18  480, 487 (9th Cir. 2000)).  Choices regarding cross-examination of government witnesses are

19  strategic and given wide latitude.  See United States v. Rodriguez-Ramirez, 777 F.2d 454,

20  458 (9th Cir. 1985).

21    Even assuming, without so finding, petitioner's trial counsel was deficient, this Court,

22  for reasons similar to those expressed by the Court of Appeal, agrees any such error was

23  harmless.  Nicole and Lori's testimony described similar encounters with petitioner in

24  Rebeca's bedroom (see Ex. 3 at 60-63, 113-118) and Nicole's concern about petitioner's

25  behavior was corroborated by Destiny, who testified that before the barbeque, Nicole asked

26  Destiny to stay with her because she felt uncomfortable at petitioner's house (Ex. 3 at 238);

27  Destiny also testified that, at the barbeque, she saw Nicole outside with petitioner, and then

28  saw Nicole pulling away while saying "No" (id. at 240).

United States District Court

For the Northern District of California

1    Further, there was considerable evidence of petitioner's guilt based on prior

2  encounters with minors other than Donald.  Carla testified that in 1981 when she was seven

3  years old, petitioner had touched her buttocks and vagina while she was in petitioner's step-

4  daughter Kathy's room (Ex. 3 at 251-53); Carla's mother provided significant corroborative

5  testimony (id. at 261-66) and the parties stipulated that petitioner pled guilty to lewd conduct

6  with a child under the age of 14 years.  (Id. at 260.)  Additionally, there was evidence from

7  Carol, an independent witness, who testified that several years earlier she had observed

8  petitioner masturbating in a movie theater (id. at 281-86), lewd conduct for which petitioner

9  stipulated he was convicted (id. at 278).  Moreover, there was evidence of petitioner's

10  consciousness of guilt, in that he fled while the instant case was pending (id. at 407) and

11  stayed out of the country for seven years (id. at 410).

12    Given the totality of the evidence against petitioner, it cannot be said "the result of

13  the proceeding would have been different" had the jury learned of Donald's 1989

14  misdemeanor conviction.  See Strickland, 466 U.S. at 694.

15    Accordingly, petitioner is not entitled to habeas relief on this claim.

16    3.    Confrontation Clause

17    Petitioner claims the trial court erroneously admitted a redacted version of his

18  probation report from the 1981 offense involving Carla.  Specifically, petitioner asserts the

19  "probation report, which was admitted for the truth of the matter asserted, was hearsay, and

20  its admission denied [petitioner] his Sixth Amendment right to cross-examine and confront

21  the witnesses against him."  (Pet. at 24.)

22    The Court of Appeal summarized the background of this claim as follows:

23        During his cross-examination of [petitioner], the prosecutor showed and
          asked [petitioner] about his statements to a probation officer in 1981
24        regarding his conviction for the offense involving
          Carla.  [Petitioner] testified that he remembered talking to the probation
25        officer, but he did not remember telling the probation officer that he let
          Carla into his home to look for a book, and he denied that he said that he
26        touched Carla on the butt.  At the conclusion of [petitioner's] testimony,
          in the presence of the jury the prosecutor moved to admit into evidence
27        exhibit No. 6, "a certified conviction for the offense in 1981" involving
          Carla.  [Petitioner] objected to the inclusion of the probation report as part
28        of the exhibit, and the court stated that they would discuss the issue
          outside the presence of the jury.

13

1                                             . . .

2          Exhibit No. 6A, which includes the redacted probation report, was later
           admitted into evidence.  As redacted, the probation report includes the
3          court data, including a description of the charges that [petitioner] pleaded
           guilty to and the charges that were dismissed, and "[Petitioner's]
4          Statement."  That statement is as follows.  "In his verbal statement,
           [petitioner] Daniel Ornelas denied committing the alleged charge and
5          indicates he was extremely confused during the Court process and pled
           guilty.  Mr. Ornelas indicated he remembers the victim visiting his
6          residence in an attempt to obtain books from his daughter, and after he
           allowed the victim to search for the books, he politely asked the victim to
7          leave his residence and shortly thereafter he was charged with the present
           offense.  However, [petitioner] did indicate, prior to his asking the victim
8          to leave, he, in a polite manner, patted her buttocks area as a gesture for
           her to leave at that time."
9
10   (Ex. 7 at 18-19.)

11          The Confrontation Clause of the Sixth Amendment provides that, in criminal cases,

12   the accused has the right to "be confronted with the witnesses against him."  U.S. Const.

13   amend. VI.  The ultimate goal of the Confrontation Clause is to ensure reliability of

14   evidence, but it is a procedural rather than a substantive guarantee.  Crawford v.

15   Washington, 541 U.S. 36, 61 (2004).  It commands not that evidence be reliable, but that

16   reliability be assessed in a particular manner: by testing in the crucible of cross-

17   examination.  See id.; see also Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting "a

18   primary interest" secured by the Confrontation Clause "is the right of cross-examination").

19   The right to cross-examine under the Confrontation Clause provides the opportunity to

20   "expose to the jury the facts from which jurors . . . could appropriately draw inferences

21   relating to the reliability of the witness."  Davis, 415 U.S. at 318.

22          The Confrontation Clause applies to all "testimonial" statements.  Crawford, 541

23   U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the

24   purpose of establishing or proving some fact."  Id. at 51 (internal quotation and citation

25   omitted).  The Confrontation Clause is satisfied when the declarant is available at trial and

26   subject to cross-examination.  See Crawford, 541 U.S. at 59 n.9 ("The Clause does not bar

27   admission of a statement so long as the declarant is present at trial to defend or explain it.")

28          "Confrontation Clause violations are subject to harmless error analysis."  United

States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004); see also United States v. Allen, 425

14

1   F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the

2   standard is whether the allegedly inadmissible evidence "'had substantial and injurious

3   effect or influence in determining the jury's verdict.'"  Hernandez v. Small, 282 F.3d 1132,

4   1144 (9th Cir. 2002) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

5       The Court of Appeal found petitioner's statement to the probation officer was

6   properly admitted because it "was not admitted to prove the facts underlying the prior

7   conviction," but rather was admitted "as a party admission (Evid. Code, § 1220) recorded

8   in an official record (Evid. Code, § 1280) that was inconsistent with [petitioner's] trial

9   testimony.  (Evid. Code, § 1235.)"  (Ex. 7 at 22.)

10      The Court of Appeal's determination of this issue was not an unreasonable

11  application of Supreme Court law.  First, the Supreme Court has held the Confrontation

12  Clause "does not bar the use of testimonial statements for purposes other than establishing

13  the truth of the matter asserted."  See Crawford, 541 U.S. at 59, n.9 (citing Tennessee v.

14  Street, 471 U.S. 409, 414 (1985)).  Second, petitioner, who testified at the trial, was the

15  declarant of the challenged statements introduced through the redacted probation report,

16  and, indeed, was questioned about those statements while on the witness stand;

17  consequently, petitioner was able to "defend or explain" the statements.  See Crawford, 541

18  U.S. at 59 n.9 (holding Confrontation Clause not violated where declarant testifies and is

19  available for cross-examination).

20      Accordingly, petitioner is not entitled to habeas relief on this claim.

21      4.    Jury Instruction

22      Petitioner claims the trial court erred in instructing the jury pursuant to CALCRIM

23  No. 1191  (Evidence of Uncharged Sex Offenses).  According to petitioner, this instruction

24  allowed the jury to find him guilty by a preponderance of the evidence.  (Pet. at 31.)

25      The jury was instructed under CALCRIM No. 1191 as follows:

26          The People presented evidence that the defendant committed the crimes of
            Penal Code section 288(a), Lewd or Lascivious Act on a Child Under the
27          Age of 14 Years, and Penal Code section 647(a) Indecent Exposure, that
            were not charged in this case.  These crimes are defined for you in these
28          instructions.

United States District Court

For the Northern District of California

1    You may consider this evidence only if the People have proved by a
     preponderance of the evidence that the defendant in fact committed the
2    uncharged offenses.  Proof by a preponderance of the evidence is a
     different burden of proof from proof beyond a reasonable doubt.  A fact is
3    proved by a preponderance of the evidence if you conclude that it is more
     likely than not that the fact is true.

4
     If the People have not met this burden of proof, you must disregard this
5    evidence entirely.

6    If you decide that the defendant committed the uncharged offenses, you
     may, but are not required to, conclude from that evidence that the
7    defendant was disposed or inclined to commit sexual offenses, and based
     on that decision, also conclude that the defendant was likely to commit
8    and did commit violations of Penal Code section 288(a), as charged here.
     If you conclude that the defendant committed the uncharged offenses, that
9    conclusion is only one factor to consider along with all the other evidence.
     It is not sufficient by itself to prove that the defendant is guilty of
10   violations of Penal Code section 288(a).  The People must still prove each
     element of the charge beyond a reasonable doubt.

11   (Ex. 1 at 185-86.)

12          A challenge to a jury instruction solely as an error under state law does not state a

13   claim cognizable in federal habeas corpus proceedings.  See Estelle, 502 U.S. at 71-72.  To

14   obtain federal collateral relief for errors in the jury charge, a petitioner must show that "'the

15   ailing instruction by itself so infected the entire trial that the resulting conviction violates

16   due process.'"  Id. at 72 (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)).  The

17   instruction may not be judged in artificial isolation, but must be considered in the context

18   of the instructions as a whole and the trial record.  Id.

19          The Court of Appeal rejected petitioner's claim as follows:

20
     Prior to giving of the instructions at the conclusion of the trial, the court
21   asked both parties whether there were "any additional instructions that
     you requested or any disagreements you had with any of the instructions
22   that the Court's prepared to give?"  Both parties responded, "No, Your
     Honor."  [Petitioner] now contends that CALCRIM No. 1191 violates his
23   right to due process and a fair trial because it allowed the jury to find the
     fact of the prior crimes true and infer predisposition using a
24   preponderance-of-the-evidence standard, and it allowed the jury to infer
     his guilt of the charged offenses merely from propensity evidence.  He
25   argues that review is allowed and reversal is required even absent his
     objection below.
26

27
     [Petitioner] acknowledges that our Supreme Court rejected a similar
28   challenge to CALJIC No. 2.50.01.  (See Reliford, supra, 29 Cal.4th 1007.)

                                         16

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

[Petitioner] also acknowledges that the appellate court in *People v. Schnabel* (2007) 150 Cal.App.4th 83 (*Schnabel*), concluded that the version of CALJIC No. 2.50.01 considered in *Reliford* is materially similar to CALCRIM No. 1191 in its explanation of the law. However, he contends that the *Schnabel* decision should not be followed by this court.

In *Reliford*, our Supreme Court found that "the 1999 version of the CALJIC No. 2.50.01 correctly states the law." (*Reliford, supra*, 29 Cal.4th at p. 1009.) It also found that the 2002 revision of the instruction, which deleted one sentence and added another, was "an improvement." (*Id.* at p. 1016.) "The version of CALJIC No. 2.50.01 considered in *Reliford* is similar in all material respects to . . . CALCRIM NO. 1191 (which was given here) in its explanation of the law on permissive inferences and the burden of proof." (*Schnabel, supra*, 150 Cal.App.4th at p. 87, fn. omitted.) "Although the instruction considered in *Reliford* was the older CALJIC No. 2.50.01, there is no material difference in the manner in which each of the instructions allows the jury to conclude from the prior conduct evidence that the defendant was disposed to commit sexual offenses, and therefore, likely committed the current offenses. CALCRIM No. 1191, as given here, cautions the jury that it is not required to draw these conclusions and, in any event, such a conclusion is insufficient, alone, to support a conviction. Based on *Reliford*, we therefore reject [petitioner's] contention that the instruction violated his due process rights." (*People v. Cromp* (2007) 153 Cal.App.4th 476, 480; see also, *Schnabel*, supra, 150 Cal.App.4th at p. 87; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

(Ex. 7 at 23-24.)

As set forth by the Court of Appeal, the California Supreme Court has interpreted CALJIC 2.50.01, the prior version of CALCRIM 1191, and has found that instruction, as so interpreted, does not reduce the prosecution's burden of proof. See People v. Reliford, 29 Cal. 4th 1007 (2003). As noted, CALJIC 2.50.01, the instruction considered in Reliford, is in all material respects the same as CALCRIM No. 1191, the instruction given at petitioner's trial. See People v. Schnabel, 150 Cal. App. 4th 83, 87 (2007). This Court must defer to the California courts' interpretation of its own laws. See Estelle, 502 U.S. at 67-68 (holding federal writ not available for alleged error in the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal statutes"). Moreover, recent Ninth Circuit authority is in accord with the California Supreme Court's holding on the issue. See Schultz v. Tilton, 659 F.3d 941 (9th Cir. 2011) (holding 2002

1  version of CALJIC 2.50.01 comports with due process).

2       Accordingly, petitioner is not entitled to habeas relief on this claim.

3  C.   Appealability

4       The federal rules governing habeas cases brought by state prisoners require a district

5  court that issues an order denying a habeas petition to either grant or deny therein a

6  certificate of appealability.  See Rules Governing § 2254 Cases, Rule 11(a).

7       A judge shall grant a certificate of appealability "only if the applicant has made a

8  substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

9  certificate must indicate which issues satisfy this standard, id. § 2253(c)(3).  "Where a

10 district court has rejected the constitutional claims on the merits, the showing required to

11 satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable

12 jurists would find the district court's assessment of the constitutional claims debatable or

13 wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

14      Here, petitioner has not made such a showing, and, accordingly, a certificate of

15 appealability will be denied.

16 D.   Request for Counsel

17      Petitioner has filed a request for appointment of counsel.  (Dkt. No. 19.)

18      The Sixth Amendment's right to counsel does not apply in habeas corpus actions.

19 See Knaubert v. Goldsmith, 791 F.2d 722, 728 (9th Cir.), cert. denied, 479 U.S. 867 (1986).

20 However, 18 U.S.C. § 3006A(a)(2)(B) authorizes a district court to appoint counsel to

21 represent a habeas petitioner whenever "the court determines that the interests of justice so

22 require" and such person is financially unable to obtain representation.  Appointment is

23 mandatory only when the circumstances of a particular case indicate that appointed counsel

24 is necessary to prevent due process violations.  Chaney v. Lewis, 801 F.2d 1191, 1196 (9th

25 Cir. 1986).

26      Here, petitioner's claims have been adequately presented in the petition, and the

27 interests of justice do not otherwise require the appointment of counsel.  Accordingly,

28 petitioner's request for appointment of counsel will be denied.

United States District Court

For the Northern District of California

**IV.  CONCLUSION**

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

Further, petitioner's request for appointment of counsel is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Connie Gipson on the docket as the respondent in this action.

IT IS SO ORDERED.

DATED: March 29, 2012

MAXINE M. CHESNEY
United States District Judge